IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES D. MYERS,

        Plaintiff,

  v.                                  Civil Action 2:19-cv-2060
                                        Judge George C. Smith
                                        Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, James D. Myers, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 9) be **OVERRULED** and that judgment be entered in favor of Defendant.

    **I.**      **BACKGROUND**

Plaintiff filed his application for DIB in January 2013, and his application for SSI in July 2013. Both applications allege that he was disabled beginning December 21, 2012. (Tr. 183–84). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on December 16, 2014. (Tr. 40–82). On January 16, 2015, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 18–39). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–5). Plaintiff then filed a case in the United States District Court for the Northern District of West Virginia. That court remanded the case back to the Commissioner on September 12, 2016. (Tr. 570–71).

Another administrative hearing was held on May 18, 2017, (Tr. 472–536), and the ALJ issued an unfavorable decision on September 18, 2017. (Tr. 445–64) The Appeals Council again denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. Plaintiff filed the instant case seeking a review of the Appeals Council's decision on May 20, 2019 (Doc. 1), and the Commissioner filed the administrative record on July 29, 2019 (Doc. 8). This matter is now ripe for review. (*See* Docs. 9, 11).

In his decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 21, 2012, the alleged onset date. (Tr. 448). He found that Plaintiff suffers from the following severe impairments: multiple sclerosis and diagnoses of persistent dysthymic disorder, unspecified personality disorder, amnestic disorder (not otherwise specified), and cognitive disorder (not otherwise specified). (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 450).

> As for Plaintiff's residual functional capacity ("RFC"), the ALJ opined:
>
> [T]he claimant has the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) subject to some additional nonexertional limitations. More specifically, the claimant is able to: lift and/or carry up to 10 pounds occasionally and less than 5 pounds frequently; sit with normal breaks for 6 to 8 hours out of an 8-hour workday; and stand and/or walk with normal breaks for up to 2 hours out of an 8-hour workday. He also requires the use of a cane, as needed, to ambulate. He can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He must avoid concentrated to temperature extremes, vibration, fumes, dusts, odors, gases, poor ventilation, and hazards of moving plant machinery and unprotected heights. He is unable to do commercial driving and is limited to simple, unskilled work involving occasional interaction with supervisors, coworkers, and the public. Finally, the work must be performed in a low stress work setting with no rapid production quotas or assembly line work, limited decision-making responsibilities, and few changes in the work setting.

(Tr. 452).

### A. Relevant Hearing Testimony

The ALJ summarized the testimony from Plaintiff's hearing:

Over the course of two hearings, the claimant testified that he is married and has one child (currently age 6). He indicated that his family supports itself through his wife's employment as a flight attendant. He testified that he has a 9th grade education, but indicated that he obtained his GED and is able to read, write, and perform simple math. The claimant initially alleged disability due to intermittent vertigo, double vision, and loss of focus.

At the first hearing, the claimant testified that he stopped working in 2012 because of impaired vision and vertigo secondary to an earlier diagnosis of multiple sclerosis. He reported that he did not feel like it was safe for him to be behind the wheel as a truck driver. He also indicated that no treating physician advised him that his driver's license should be revoked. The claimant testified that he was taking Aubagio and Naproxen for his medical conditions at that time. Despite that treatment, the claimant reported that he continued to experience memory issues, double vision, right upper extremity numbness, and an unsteady gait. Overall, he asserted that he was able to lift 20 to 25 pounds at one time, stand for 20 to 30 minutes at one time, and walk 15 to 20 minutes at one time.

At the second hearing, the claimant continued to report residual effects of his multiple sclerosis, such as double vision, headaches, memory issues, weakness, and fatigue. He also indicated that he was taking Betaseron and Ibuprofen for his physical issues. Overall, the claimant reported that he was able to repetitively lift 1 pound, sit for 1 hour at a one time, and stand 15 to 30 minutes at one time. The claimant also reported that he has problems with depression and anxiety for which he takes Cymbalta, but he indicated that he has never seen a psychologist or psychiatrist and was unable to recall where he received individual therapy during the alleged period of disability.

(Tr. 453).

### B. Relevant Medical Evidence

The ALJ also usefully summarized Plaintiff's medical records and symptoms. First, he considered the records documenting Plaintiff's physical impairments:

In assessing the claimant's residual functional capacity, the undersigned first points out that his claim for disability has two distinct components. The first part is related to his multiple sclerosis and the second component is related to his overall mental health condition. The undersigned will first address the claimant's multiple sclerosis diagnosis. The claimant was seen for a consultative examination performed by Dr. Sethi in April 2013. The claimant reported a history of intermittent headaches, vertigo, and lack of vision secondary to multiple sclerosis.

3

The claimant also indicated that he was not on any medications for any physical or mental diagnosis. He indicated that he had stopped working on the alleged onset date because he was involved in a motor vehicle accident while at work and his employer fired him over the incident (Exhibit 8F/2).

Dr. Sethi's physical examination revealed that the claimant was well-built, well-nourished , and in no acute distress. The examination of the claimant's head, eyes, ears, nose, throat, neck, chest, heart, and abdomen were normal. The claimant had mildly reduced range of motion of the dorsolumbar spine, varying sensation in the right lower extremity, and he reported being unable to walk on his tiptoes. Otherwise, the claimant had normal range of motion of the cervical spine, shoulders, elbows, wrists, hands, fingers, hips, knees, and ankles. He also exhibited 5/5 strength in all four extremities and with grasping, manipulations, pinching, and fine coordination (Exhibit 8F). Dr. Sethi's opinion is addressed in the opinion section of the decision located below the analysis of the claimant's treatment evidence.

As far as treatment is concerned, the claimant first sought treatment with his primary care provider, Dr. Seco, in April 2014 for reports of a discolored brown area on his right foot. The claimant also reported right arm numbness, fatigue, and dizziness at times due to an earlier diagnosis of multiple sclerosis. However, he indicated that he did not take any medications for multiple sclerosis and just dealt with the symptoms. The claimant also specifically denied any issues with confusion, disorientation, impaired memory/judgment, anxiety, loss of interest, incontinence, frequency/urgency, blurred vision, vision loss, back pain, joint pain, joint swelling, joint effusion, limited range of motion, muscle aches, muscle weakness, stiffness, focal weakness, headaches, facial drooping, incoordination, or any falls in the preceding six months. The claimant also reported that he was taking care of his 3-year-old son while his wife worked (Exhibit 5F/5–21).

The claimant continued to follow up with Dr. Seco's office through August 2014. At the final visit, the claimant specifically denied any issues with focal weakness, dizziness, headache, facial drooping, incoordination, memory problems, numbness, seizures, slurred speech, tremor, joint pain, joint swelling, limited range of motion, muscle aches, muscle weakness/stiffness, anxiety, sadness/tearfulness, or loss of interest. The physical examination at this visit also revealed that the claimant was comfortable, alert, and oriented. He had a normal range of motion of the neck and his respiratory system and cardiovascular system were also normal. The claimant's abdominal area was nontender without any other abnormality being noted. The examinations of the claimant's head, neck, and back were normal. The claimant also exhibited normal range of motion of the upper extremities, low back, and lower extremities. The claimant had normal stability, muscle strength, and muscle tone of all four extremities along with normal deep tendon reflexes, sensation, gait, and station (Exhibit 5F/76–89).

The claimant also established treatment with Dr. Zyznewsky, a neurologist, in June 2014 with reports of headaches, balance problems, and tingling/numbness of the right upper extremity and left lower extremity. The claimant reported that he had been diagnosed with multiple sclerosis approximately twenty (20) years prior to this visit due to experiencing double vision at that time. The claimant indicated that he had never really had any follow-ups for the condition since that date (Exhibit 7F/2).

As a result, Dr. Zyznewsky had the claimant undergo updated testing in the form of a brain MRI, an EEG, an EMG/nerve conduction study, and a duplex can of the carotid cervical area. The brain MRI revealed the presence of multiple foci and white matter consistent with multiple sclerosis, but there was no acute intracranial process (Exhibit 7F/8–9). The EEG was normal (Exhibit 7F/5). The EMG/nerve conduction study was also normal specifically indicating that the nerve conduction velocities and needle studies of the lower extremities were normal and no evidence of radiculopathy or neuropathy was present (Exhibit 7F/4). The duplex scan revealed no significant stenosis (Exhibit 7F/7).

Based upon these findings, Dr. Zyznewsky placed the claimant on Aubagio, which the claimant indicated he was tolerating well except for some residual diarrhea. Dr. Zyznewsky also prescribed the claimant a cane. In November 2014, the claimant told Dr. Zyznewsky that he was no longer taking Aubagio because his hair was falling out. Dr. Zyznewsky offered the claimant Tecfidera as a replacement medication, but the claimant did not return his call and was a no show for his final scheduled appointment in February 2015 (Exhibits 6F, 7F, and l0F).

The claimant then had a break in treatment for his multiple sclerosis until he established with a new neurologist, Dr. Paris, in February 2017. At this visit, the claimant reported that he was experiencing double vision on and off, right arm and left leg numbness, and left leg weakness while walking. He also indicated that he had not been on any medications for his multiple sclerosis recently. In fact, the claimant reported that he had only taken Betaseron for 6 months approximately 20 years prior to his visit with Dr. Paris (Exhibits 16F/2 and 8).

The physical examination revealed that the claimant had mild hand tremors, decreased sensation in the left leg, and an ataxic gait. Otherwise, the claimant was awake, alert, and in no acute distress. The claimant's mental status examination was normal and he had normal strength in the bilateral upper extremities and right lower extremity. His left lower extremity strength was 4-/5. The claimant's cranial nerves were also intact (Exhibit 16F). Based upon this examination, Dr. Paris had the claimant undergo a brain and cervical spine MRI. The results indicated that there was white matter present in the brain consistent with and areas of abnormal signal in the cervical spine, both consistent with multiple sclerosis. There was no evidence of enhancement (Exhibit 16F/8).

The claimant returned to Dr. Paris's office for a follow-up visit in April 2017 at which point she indicated that she had reviewed the records from the claimant's previous neurologists. The claimant reported that the symptoms he reported experiencing at his first visit occurred when he experienced a flare-up in his multiple sclerosis. He stated in the past the flare-ups resolved with a Medrol Dosepak. At that time, the claimant denied any issues with headache, dizziness, unilateral weakness, numbness, chest pain, or palpitations. Dr. Paris diagnosed the claimant with relapsing remitting multiple sclerosis and suggested that he be treated with Betaseron and Vitamin B12 (Exhibit 16F).

The claimant also had a physical consultative examination performed by Dr. Schmitt in February 2017. The claimant continued to report symptoms stemming from his multiple sclerosis, but indicated he was not taking any medications for this condition. The claimant used a cane for ambulation and his gait was shuffling. The physical examination revealed decreased pinprick sensation in the left upper and left lower extremity. The claimant also exhibited decreased grip strength bilaterally. The claimant required assistance getting on and off the examination table and his fine manipulations were impaired, but he was able to make a fist, his hand was able to be fully extended, and his fingers were able to be opposed. The claimant also exhibited normal range of motion of the cervical spine, shoulders, elbows, wrists, lumbar spine, hips, knees, and ankles. His upper extremity strength was 3/5 bilaterally and his lower extremity strength was 4/5 bilaterally (Exhibit 12F). Dr. Schmitt's opinion is also addressed in the opinion section of the decision located below the analysis of the claimant's treatment evidence

(Tr. 454–56).

Second, he considered the records concerning Plaintiff's mental health:

The mental status examination revealed that the claimant was sad, anxious, restless, and fidgety. Otherwise, the claimant's sensorium, cognitive functioning, insight, and judgment were unremarkable except that his anxiety increased as he was posed proverbs and asked to recall objects after a delay. Based upon this examination, Dr. Bousquet diagnosed the claimant with dysthymic disorder, anxiety disorder, amnestic disorder (not otherwise specified), and a cognitive disorder (not otherwise specified) (Exhibit 4F). Dr. Bousquet's opinion is also addressed in the opinion section of the decision located below the analysis of the claimant's treatment evidence.

In March 2017, the claimant was evaluated by Dr. Mansuetto. The claimant reported difficulties focusing along with symptoms consistent with depression and anxiety. The claimant indicated that he had just started receiving individual therapy and he was taking Cymbalta for his mental symptoms. The claimant also reported that he had been smoking marijuana on a daily basis, but had stopped at an unknown time. He also reported that he had previously been cited for one DUI offense. The mental status examination revealed an apathetic mood, blunted affect, deficient

6

concentration, and slowed pace. The claimant's appearance, attitude, behavior, speech, orientation, thought process, thought content, perception, insight, psychomotor, judgment, immediate memory, remote memory, persistence, and social functioning were within normal limits (Exhibit 13F).

Generally speaking, the medical evidence does not reveal any type of recurrent complaints involving depression, anxiety, or mental abnormalities during any of his routine treatment visits with various providers across the longitudinal period at issue. Likewise, there is no indication that the claimant received any sort of medication or specialized mental health treatment from a counselor, psychologist, or psychiatrist in an attempt to deal with any severe mental symptoms at any time from the alleged onset date of December 21, 2012, through in or around March 2017 (Exhibits 5F, 7F, 9F, and l0F). Moreover, prior to the date of this decision the claimant's representatives did not submit any evidence regarding the presence of mental health treatment despite indicating in May 2017 that they would be submitting said documentation (Exhibit 27E/2).

(Tr. 456–57).

### C. The ALJ's Decision

Upon review of the above-described evidence, the ALJ concluded that "the objective medical record does not support the degree of impairment alleged by the claimant" and that Plaintiff's "severe physical and mental impairments" are "adequately accommodated" through the RFC. (Tr. 457).

As for the opinion evidence, the ALJ first considered the opinions of the state agency physical consultants, who determined that Plaintiff is capable of performing a range of work between the light and sedentary exertional levels subject to some additional postural and environmental limitations. (*Id*.). The ALJ gave these opinions little weight because neither consultant examined Plaintiff, and the treatment evidence shows that Plaintiff's "relapsing remitting multiple sclerosis reasonably limits him to sedentary work activities." (Tr. 458).

The ALJ then turned to the state agency mental consultants, who opined that even with Plaintiff's mental symptoms he would be able to understand, remember, and carry out 1 to 3 step tasks in a relatively static environment, relate to others on a superficial basis, and adapt to changes

7

explained in advance. (Tr. 457–58). The ALJ assigned these opinions great weight, explaining that they are "largely supported by the mental examinations . . . consistent with the claimant's lack of treatment as outlined above and are the most consistent with the longitudinal review of the evidence of record with regard to the claimant's mental symptoms." (Tr. 458).

Next, the ALJ considered the opinion of Dr. Sushil Sethi, who opined in April 2013 that Plaintiff's ability to do work-related physical activities is limited. (*Id*.). The ALJ afforded this opinion little weight, explaining that it is "vague and does not define what the term 'limited' means from a functional standpoint," and that as a result, "the limitations are not quantifiable for purposes of establishing function-by-function physical limitations under the Social Security Rules and Regulations." (*Id*.).

The ALJ then considered the opinion of psychologist David Bousquet, who opined in May 2013 that Plaintiff "would be expected to have some difficulties" in his ability to understand, remember, and carry out instructions in a work setting and that there would "be times when he will have some difficulties" with his abilities to respond appropriately to work place stresses and pressures, but that he is capable of conforming to social expectations in a work setting. (*Id*.). The ALJ assigned this opinion little weight, explaining that the limitations regarding concentration and response to work place stresses and pressure "are not quantifiable for purposes of establishing nonexertional mental limitations" and further, "do not contain any indication what the claimant is able to do or cannot do." (*Id*.). And, regarding Bousquet's opinion on Plaintiff's ability to function socially, the ALJ found it is "not supported by a review of the longitudinal record," which supports Plaintiff's ability to occasionally interact with coworkers, supervisors, or the public. (*Id*.).

Next, the ALJ considered the opinions of licensed psychologist, M. Aileen Mansuetto, who opined that "[i]t is highly unlikely" that Plaintiff "is going to be employable at this point,

8

particularly if the MS diagnosis is accurate," and that Plaintiff has a "moderate limitation" in his ability to understand, remember, and carry out simple or complex instructions and respond appropriately to changes to usual work situations and changes in a routine work setting. (Tr. 459). The ALJ assigned this opinion little weight, explaining, *inter alia*, that it is internally inconsistent and relies heavily on Plaintiff's subjective reports of symptoms and limitations. (*Id*.).

Finally, the ALJ considered the opinion of Dr. Thomas Schmitt, who opined in January 2017 that Plaintiff can "never" perform numerous physical activities, including, for example, lifting, carrying, sitting, standing, or walking. (*Id*.). The ALJ assigned this opinion little weight, explaining that it is "completely out of proportion to the longitudinal review of the evidence" and relies "heavily" on Plaintiff's subjective reports. (*Id*.).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence,

it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

Plaintiff asserts one assignment of error, that the ALJ improperly evaluated the mental and physical health opinion evidence of record. (Doc. 9 at 6–13).

"The Social Security Administration defines three types of medical sources: non-examining sources, non-treating (but examining) sources, and treating sources." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 273 (6th Cir. 2015) (citing 20 C.F.R. § 404.1502). "A physician qualifies as a treating source if there is an 'ongoing treatment relationship' such that the claimant sees the physician 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Id.* (citing 20 C.F.R. § 404.1527(c)(2)). If the treating physician's opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record,' then an ALJ 'will give it controlling weight.'" *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)). And, when an ALJ does not give the treating source's opinion controlling weight, the ALJ must give "'good reasons'" for discounting the opinion. *Id.* (quoting *Rogers*, 486 F.3d at 242).

On the other hand, when the opinion comes from a non-treating or non-examining source, it is usually not entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2). Rather, the ALJ should consider relevant factors, including supportability, consistency, and specialization. 20 C.F.R. § 404.1527(d)(2). There is however, no "reasons-giving requirement" for non-treating source opinions. *Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016). Rather, the ALJ must provide only "a meaningful explanation regarding the weight given to particular medical

source opinions." *Mason v. Comm'r of Soc. Sec.*, No. 1:18 CV 1737, 2019 WL 4305764, at *7 (N.D. Ohio Sept. 11, 2019) (citing SSR 96-6p, 1996 WL 374180, at *2).

Here, the Commissioner seems to rely on the stricter standard governing treating source opinions. (*See, e.g.*, Doc. 11 at 5, 11). But, the Undersigned finds, and Plaintiff does not state otherwise, that there are no treating source opinions of record. Rather, the medical opinions come from: examining but non-treating state psychology consultants (Tr. 89–91, 105–06); Dr. Sushil Sethi, a one-time examining medical consultant (Tr. 402–04); David Bousquet, a one-time examining psychological consultant (Tr. 283–90); M. Aileen Mansuetto, a one-time examining psychological consultant (Tr. 760–68); and Dr. Thomas Schmitt, a one-time examining medical consultant (Tr. 746–58).

Accordingly, the ALJ was not required to assign controlling weight to these opinions or provide "good reasons" for discounting them. *See Martin*, 658 F. App'x at 259. Instead, the ALJ must have provided a "meaningful explanation regarding the[ir] weight[.]" *Mason*, 2019 WL 4305764, at *7.

**A. Mental Health Opinion Evidence**

Plaintiff makes two arguments regarding the ALJ's treatment of the mental health opinion evidence: (1) that the ALJ failed to incorporate the state psychologists' limitations into the RFC; and (2) that the ALJ improperly evaluated the opinion of examining psychologist M. Aileen Mansuetto. (*See* Doc. 9 at 6–11).

First, Plaintiff contends that, because the ALJ afforded great weight to the opinions of the state agency psychologists, he should have accounted for each of their opined limitations in the RFC, or at the very least, explained why he excluded any limitations. (Doc. 9 at 8). Specifically, Plaintiff asserts that, because the state psychologists limited him to only superficial and occasional

interactions with the public, the ALJ erred in limiting him to only occasional interactions with the public and excluding the specific limitation of "superficial." (*Id.*).

Plaintiff's argument fails. The Sixth Circuit has rejected the argument that an ALJ must explain every omitted restriction from a non-treating physician's opinion. In *Martin v. Commissioner of Social Security*, the plaintiff argued that the ALJ failed to adopt certain limitations espoused by a non-examining source and a one-time consultative examiner. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016). The Sixth Circuit found no reversible error:

> Martin protests the ALJ's lack of explanation as to why Martin's marked impairment in interacting with the general public—as found by Dr. Joslin—and his moderate to marked impairment in his ability to sustain concentration—as found by Dr. Rutledge—were not explicitly incorporated into Martin's RFC. But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions.

*Id.* at 259; *see also Reeves*, 618 F. App'x at 275 ("Although the ALJ gave great weight to Dr. Torello's opinion, he was not required to incorporate the entirety of her opinion, especially those findings that are not substantially supported by evidence in the record."); *Mason*, 2019 WL 4305764, at *10 (finding that the ALJ was not required to adopt all of the non-treating source's limitations).

The same reasoning applies here. The ALJ was not required to explain why he excluded the limitation of only "superficial" interactions with the public. Yet it is clear from his opinion why he did. In reviewing the record, the ALJ found that Plaintiff has only moderate limitations in interacting with others. (Tr. 451; *see also* Tr. 458). He explained:

> In interacting with others, the claimant has moderate limitations. Here, the claimant indicated that he is able to get along with family, friends, neighbors, authority figures, and other people without difficulty. The claimant also reported being the primary caretaker of his young son and is able to go out alone (Exhibits 4E, 4F, 13F, and Hearing Testimony dated 12/16/14 and 5/18/17). The medical evidence

> shows that the claimant had a good rapport with providers, was described as pleasant and cooperative, had good interactions with medical staff, and appeared comfortable during appointments. Further, he never exhibited any significant social abnormalities during routine appointments.

(Tr. 451).

In sum, substantial evidence supports the ALJ's decision to limit Plaintiff to only occasional rather than occasional and superficial interaction with the public.

Turning to Plaintiff's second argument regarding the opinion evidence, he contends that the ALJ improperly discounted the opinion of licensed psychologist Mansuetto, (Doc. 9 at 9–10), who opined in January 2017, that "[i]t is highly unlikely that [Plaintiff] is going to be employable at this point, particularly if the MS diagnosis is accurate." (Tr. 764). Mansuetto also completed a medical source statement, finding that Plaintiff has moderate limitations in his ability to understand and remember simple instructions, carry out complex instructions, make judgments on complex work-related decisions, and that he would never be able to interact appropriately with the public, supervisors, or coworkers. (Tr. 760–68). Essentially, Plaintiff argues that Mansuetto's exam notes reveal greater limitations than the "check the box" medical source statement, and that the ALJ should have relied more on the detailed exam notes than the administrative form. (Doc. 9 at 9–10).

Up front, because Mansuetto examined Plaintiff only once, "the reasons-giving requirement is inapplicable to [Mansuetto's] opinion." *Martin*, 658 F. App'x at 259. Rather, as noted, the ALJ was required to provide only "a meaningful explanation regarding the weight given to particular medical source opinions." *Mason*, 2019 WL 4305764, at *7. The ALJ did that here.

First, the ALJ found that Mansuetto's opinions "contain inconsistencies, which renders them less persuasive." (Tr. 459). He elaborated:

> For example, Dr. Mansuetto states that the claimant is "unemployable" in the body of her report, but indicates that the claimant is able to function satisfactorily in all areas required to mentally sustain work-related activities on her "Medical Source Statement." These discrepancies call into question the veracity of both opinions since they are on opposite ends of the spectrum with respect to a disability finding in this case.

(*Id.*).

Second, the ALJ noted that Manusettos' opinions "rely heavily on the subjective report of symptoms and limitations provided by the claimant and the totality of the evidence does not support the 'unemployable' statement." (*Id.*). The ALJ explained:

> For example, Dr. Mansuetto indicated throughout her report that she was relying on the claimant's subjective complaints and/or the claimant's multiple sclerosis diagnosis in reaching her limitations. The problem with this reasoning is that the mental status examination was generally unremarkable from an objective standpoint except for deficient concentration and a slow pace. Also, the treatment evidence shows no ongoing treatment or medication for an underlying mental health condition or multiple sclerosis from December 21, 2012, until at least in or around March 2017.

(*Id.*).

Third, the ALJ reasoned that Plaintiff's multiple sclerosis "is outside" Mansuetto's area of expertise as a psychologist. (*Id.*). Finally, the ALJ noted that Mansuetto's opinion that Plaintiff is disabled or unemployable "is not a medical opinion, but is an administrative finding dispositive of a case that requires familiarity with the Regulations and legal standards set forth therein." (*Id.*).

While Plaintiff cites to numerous notes from his exam with Mansuetto, including, for example, that he "exhibited an unusual presentation during the examination," the ALJ was well within his discretion to discredit Mansuetto's opinion, finding that it was internally inconsistent, based on subjective evidence, concerned matters outside of his specialty, and contained an opinion of disability reserved for the Commissioner. As such, the Undersigned finds that the ALJ provided

a "meaningful explanation regarding the weight given to" Mansuetto's opinion, *Mason*, 2019 WL 4305764, at *7, and Plaintiff has shown no reversible error in this regard.

### B. Physical Health Opinion Evidence

Plaintiff also asserts that the ALJ failed to properly evaluate the physical health opinion evidence. (Doc. 9 at 11–13). Specifically, he avers that the ALJ improperly discounted the opinions of Dr. Sushil Sethi and Dr. Thomas Schmitt. (*Id.*).

Dr. Sethi opined in an April 2013 medical source statement that Plaintiff's ability to do work-related activities, such as sitting, standing, walking, lifting, carrying, and handling objects traveling is "limited" but that his hearing and speaking are "normal." (Tr. 402–4). The ALJ assigned this opinion little weight, explaining:

> Dr. Sethi's opinion is vague and does not define what the term 'limited' means from a functional standpoint. Therefore, the limitations are not quantifiable for the purposes of establishing function-by-function physical limitations under the Social Security Rules and Regulations.

(Tr. 458).

Dr. Schmitt, in January 2017, opined that Plaintiff is "never" able to lift, carry, sit, stand, walk, reach in any direction, handle, finger, feel, push/pull, operate foot controls, climb, balance, stoop, kneel, crouch or crawl, along with a myriad of other physical limitations. (Tr. 746–58). The ALJ afforded this opinion little weight for multiple reasons. (Tr. 459–60).

First, the ALJ found it to be "completely out of proportion to the longitudinal review of the evidence." (Tr. 459). Second, he noted that it "appears to rely heavily on the subjective report of symptoms and limitations provided by the claimant and the totality of the evidence does not support the opinion. (*Id.*). He elaborated:

> For example, the claimant did not receive any treatment for his multiple sclerosis for approximately two years prior to the date of the evaluation with Dr. Schmitt. The claimant was seen approximately one week prior by Dr. Paris, but no treatment

15

had started. The physical examination performed by Dr. Paris revealed that the claimant was awake, alert, oriented, and in no acute distress. The claimant's mental status was normal and his motor strength in the upper extremities and right lower extremity was normal. He also exhibited 4-/5 in the left lower extremity. The claimant's cranial nerves were intact and his reflexes were symmetric in the upper extremities (Exhibit 16F). The same or similar findings were made in 2013 and 2014, which was before the claimant stopped treatment altogether prior to resuming treatment in February 2017.

(Tr. 459–60).

Finally, the ALJ explained that Dr. Schmitt's opinion was not supported by Plaintiff's reported activities of daily living:

> Dr. Schmitt's opinion as it pertains to the claimant's ability to operate a motor vehicle, shop, travel without assistance, ambulate without a walker/2 canes /2 crutches, walk a block at a reasonable pace, climb a few steps, prepare a simple meal, care for personal hygiene, and sort, handle, or use files are not consistent with the claimant's reported activities of daily living or the fact that he has only used a cane for ambulation.

(Tr. 460).

Plaintiff resists these conclusions, contending that Dr. Sethi and Dr. Schmitt "are the only opinions of record to have had the opportunity to personally examine and observe [him] and provide an opinion regarding his functional capacity" and that they are "experts in disability evaluation." (Doc. 9 at 12). He also asserts that Dr. Schmitt's evaluation "revealed numerous clinical observations," including, for example, that he has a history of Multiple Sclerosis, severely compromised grip strength and gait disturbance, as well as dizziness and severe weakness in the right and left upper extremities. (*Id*.). Finally, Plaintiff, relying on records from hospital visits and exams, insists that the record "consistently documents ongoing problems with [his] physical capabilities." (*Id*. at 13).

But there are two critical problems with Plaintiff's argument. First, neither Dr. Sethi nor Dr. Schmitt are treating sources, and consequently, the ALJ was not required to give "good

16

reasons" for discounting their opinions. *See Martin*, 658 F. App'x at 259. Regardless, the ALJ closely scrutinized the record and thoughtfully compared it with the limitations expressed in Dr. Sethi's and Schmitt's opinions. And, as required, he provided a "meaningful explanation regarding the weight given to" their opinions, *Mason*, 2019 WL 4305764, at *7, explaining that they were inconsistent with both the record and Plaintiff's reports of daily activities, (Tr. 458–59).

Second, while Plaintiff relies on certain records documenting his physical problems, he is essentially asking the Court to reweigh the evidence and substitute its judgment for that of the ALJ. The law prohibits the Court from doing so. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ."); *see also Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (noting that "there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference").

In sum, substantial evidence supports the ALJ's RFC determination.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 9) be **OVERRULED** and that judgment be entered in favor of Defendant.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination

of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date: December 23, 2019                     /s/ Kimberly A. Jolson
                                            KIMBERLY A. JOLSON
                                            UNITED STATES MAGISTRATE JUDGE